UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                 Plaintiff,

   -against-

380 YORKTOWN FOOD CORPORATION, JOSEPH
FRIEDMAN, COUNTRY MARKETS OF
WESTCHESTER LTD., 344 FOOD CORP., 6040 F.P.
FOOD LLC, JESTAM GLOBAL LTD., JESTAM
INTERNATIONAL LTD., JESTAM REALTY, LLC, and
71-76 YELLOWSTONE LLC,

                 Defendants.

No. 16-cv-5250 (NSR)
OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 5/4/2020

NELSON S. ROMÁN, United States District Judge

     Plaintiff, The Great Atlantic & Pacific Tea Company, Inc. ("A&P" or "Plaintiff"), brings this

action against Defendants 380 Yorktown Food Corporation ("Yorktown"), Country Markets of

Westchester Ltd. ("Country Markets"), 344 Food Corp. ("344 Food"), 6040 F.P. Food LLC ("6040

LLC"), Jestam International Ltd. ("Jestam Int'l"), 71-76 Yellowstone LLC ("Yellowstone")

(together, the "Affiliated Companies"), Jestam Realty, LLC ("Jestam Realty"), Jestam Global Ltd.

("Jestam Global"), and Joseph Friedman ("Friedman") (collectively, the "Defendants"). (ECF No.

58.) A&P seeks (1) enforcement of two New York State Supreme Court monetary judgments against

Yorktown, totaling $3,878,083.83 plus interest; (2) a finding of alter ego liability or piercing the

corporate veil against Friedman and the Affiliated Companies; (3) declaratory judgment against

Friedman and the Affiliated Companies for alter ego and veil piercing liability under 28 U.S.C. §

2201(a); (4) avoidance and recovery of fraudulent conveyances under New York Debt and Credit

Law ("NYDCL") § 273-a; (5) avoidance and recovery of fraudulent conveyances under NYDCL §

276; and (6) attorneys' fees under NYDCL § 276-a. (*Id.*)

Presently before the Court are (1) A&P's motion for summary judgment to impose alter ego liability on the Defendants for the full amount of the judgments against Yorktown and to avoid and recover Defendants' alleged fraudulent conveyances (ECF No. 81), and (2) Defendants' motion for summary judgment dismissing A&P's claims seeking to pierce the corporate veil, A&P's fraudulent conveyance claims, and all claims asserted against Defendants Jestam Global and Jestam Realty (ECF No. 84).  For the following reasons, Defendants' motion is GRANTED in part and DENIED in part, and Plaintiff's motion is GRANTED in part and DENIED in part.[1]

## BACKGROUND

The following facts are drawn from the record and the parties' Local Rule 56.1 statements, declarations, and affidavits.  They are not in dispute unless otherwise noted.

## I.    A&P's History with Yorktown

### A.   A&P's Acquisition of the Premise and Subsequent Divestiture Agreement

In 1971, A&P began leasing supermarket premises located at 380 Downing Drive, Yorktown Heights, New York (the "Premises") pursuant to a written lease (the "Overlease") with S&H Shopping Center (the "Overlandlord").  (Pl.'s Statement of Material Facts ("Pl. 56.1"), ECF No. 83, ₱ 1; Defs.' Resp. to Pl. 56.1 ("Defs. Resp."), ECF No. 93, ₱ 1.)  Thereafter, in or about 1986, A&P acquired two grocery store chains in New York, Waldbum, Inc. and Shopwell, Inc.   (Defs.' Statement of Material Facts ("Defs. 56.1"), ECF No. 86 at ₱ 1; Pl.'s Counterstatement of Undisputed Material Facts ("Pl. Resp."), ECF No. 98, at ₱ 1; Aff. of Joseph Friedman in Supp. of Defs. Mot. for Summ. J. ("Friedman Aff."), ECF No. 88, Ex. 1 at Resp. Nos. 1-2.)  Because of these acquisitions, the New York State Attorney General ("NYAG") began investigating A&P over concerns of monopoly control over supermarket prices in Westchester County, New York.  (Defs. 56.1 ₱ 2;

---

[1]    The parties have requested oral argument. The Court denies this request.  Oral argument is discretionary, and the Court has determined that it can decide the instant motion based on the parties' written submissions.

Friedman Aff. Ex. 1 at Resp. Nos. 3-4.)  A&P and NYAG eventually entered into a settlement agreement on November 23, 1988, wherein A&P agreed to divest itself of three Westchester supermarkets (by sale or sublease) to an unaffiliated supermarket operator.  (Defs. 56.1 ¶ 3.)

## B. A&P's Sublease with Yorktown

Pursuant to the settlement agreement, A&P decided to sublease its store at the Premises.  (*Id.* ¶¶ 5-6; Friedman Aff. ¶ 9.)  After failing to reach an agreement with another supermarket operator, A&P entered into an agreement with Friedman to sublease the Premises.  (Defs. 56.1 ¶¶ 8-9; Friedman Aff. Ex. 1 at Resp. Nos. 14-16.)  To facilitate this deal, Friedman created Yorktown to take title to the sublease of the Premises and operate a supermarket thereon.[2]  (Pl. 56.1 ¶ 3; Decl. of Brett S. Theisen in Supp. of Pl.'s Mot. for Summ. J. ("Theisen Decl."), ECF No. 87, Ex. 25 ("Nov. 2014 Friedman Dep.") 18:23-19:5, 32:7-15.) Friedman was the sole shareholder of Yorktown.  (Pl. 56.1 ¶ 3; Nov. 2014 Friedman Dep. 19:6-8; Theisen Decl. Ex. 6 at Resp. No. 1.)

On July 23, 1992, A&P executed the Agreement of Sublease (the "Sublease") for the Premises with Yorktown.  (Pl. 56.1 ¶ 2; Defs. 56.1 ¶ 11; Theisen Decl. Ex. 1; Friedman Aff. Ex. 3.) From approximately 1992 through early 1999, Yorktown operated a supermarket on the Premises. (Pl. 56.1 ¶ 4; Theisen Decl. Ex. 6 at Resp. No. 62.)  During this time, Yorktown apparently generated gross revenue of approximately $5 million.  (Pl. 56.1 ¶ 5; Theisen Decl. Ex. 6 at Resp. No. 77.)  The parties dispute whether, despite this gross revenue, Yorktown struggled financially (Defs. 56.1 ¶ 15; Friedman Aff. ¶ 17; *cf.* Decl. of Brett S. Theisen in Supp. of Pl. Opp. to Defs. Mot. for Summ. J. ("Theisen Opp. Decl."), ECF No. 95, Exs. 1-6), but they do agree that from July 1992 to 1998,

---

[2]  Neither Friedman nor any other entity Friedman in which had an ownership interest personally guaranteed the Sublease.  (Defs. Response to Pl. Supp. 56.1, ECF No. 106, at Resp. No. 23; Defs. 56.1 ¶ 12; Pl. Resp. ¶ 12.)

Yorktown did not pay rent.[3]  (Pl. 56.1 ₱ 6; Defs. 56.1 ₱ 16; Theisen Decl. Ex. 6 at Resp. No. 79; Friedman Aff. ₱ 18.)  Despite years of non-payment, A&P did not declare Yorktown to be in default.[4] (Defs. 56.1 ₱₱ 18, 20; Friedman Aff. Ex. 1 at Resp. Nos. 28-29.)

On November 17, 1998, deciding that an amendment to the Sublease was appropriate, A&P and Yorktown entered into a Modification of Sublease Agreement (the "Modification Agreement"). (Pl. 56.1 ₱₱ 7-8; Defs. 56.1 ₱ 25; Theisen Decl. Ex. 2, *id.* Ex. 8 ₱₱ 9-14.)  The Modification Agreement, among other things, (1) set a fixed rent schedule of $7,500 per month, which increased to $14,500 per month beginning on January 1, 2000; and (2) provided that neither party was in default of the Sublease.  (Pl. 56.1 ₱ 8; Theisen Decl. Ex. 2 at 1-4.)  In entering this agreement, A&P did not pursue approximately $1.3 million in unpaid rent.  (Friedman Aff. Ex. 1 at Resp. No. 38-39.)

### C.  Yorktown's Sub-Sublease with Turco's North

Three days after executing the Modification Agreement, Yorktown agreed to a sub-sublease of the Premises with Turco's North, a supermarket operator (the "Sub-Sublease").[5]  (Pl. 56.1 ₱ 9; Defs. 56.1 ₱ 32.)  With Turco's as its sub-subtenant, Yorktown ceased its supermarket operations and pivoted towards solely acting as a sub-sublandlord of the Premises.  (Defs. 56.1 ₱₱ 33-34; Pl. 56.1 ₱ 11; Friedman Aff. ₱ 29; Theisen Decl. Ex. 7 at Resp. No. 154.)  Yorktown's sole source of revenue became the rent received from the Sub-Sublease.  (Pl. 56.1 ₱ 11; Defs. 56.1 ₱ 35; Friedman

[3]  The parties dispute why Yorktown withheld rent.  A&P contends that Yorktown did so because it had asserted that A&P violated terms of the Sublease.  (Pl. 56.1 ₱ 6; Defs. Resp. ₱ 6; Theisen Decl. Ex. 6 at Resp. No. 79.) Defendants counter that financial difficulties made it unable to pay rent.  (Defs. 56.1 ₱ 16.)
[4]  Although the parties agree that A&P's decision not to evict Yorktown was partially motivated by A&P's desire to avoid antitrust issues (Defs. 56.1 ₱ 22; Pl. Resp. ₱ 22), A&P maintains that Friedman recognized that A&P wanted a rent-paying tenant.  (Theisen Decl. Ex. 8 ₱₱ 9, 16, 22.)
[5]  Yorktown agreed to the Sub-Sublease without giving prior notice to A&P.  (Pl. 56.1 ₱ 9.)  As a result, on February 3, 1999, A&P filed suit in the Supreme Court of the State of New York, Westchester County ("Westchester Supreme Court"), to have the Modification and Sub-Sublease declared void.  (Defs. 56.1 ₱ 37.) A&P argued that the Modification Agreement was void "due to [Yorktown's] alleged misrepresentation that it intended to renovate the store and upon [its] omission to inform [A&P] that it was negotiating with Turco's to sub-sublease the premises."  (Friedman Aff. Ex. 8 at 5.)  By order dated September 6, 2000, the Westchester Supreme Court granted summary judgment dismissing A&P's claims.  (*Id.* at 11.)  Notably, the court recognized that Yorktown did not need to notify A&P of any assignment.  (*Id.* at 3-4.)

4

Aff. ¶ 30; Theisen Decl. Ex. 7 at Resp. No. 155.)  From 1999 through 2011, the fixed rent payments

Yorktown received pursuant to the Sub-Sublease exceeded the rent it owed to A&P by at least

(1) $26,606.67 from March 1, 1999 through June 28, 2002; (2) $27,891.25 from June 29, 2002

through June 28, 2007; and (3) $29,175.83 from June 29, 2007 through June 28, 2012.  (Pl. 56.1 ¶

12; Theisen Decl. Ex. 7 at Resp. No. 156; *compare id.* Ex. 2 at 2-3 *with id.* Ex. 3 at 5-6.)  The parties

dispute whether the Sub-Sublease allowed Yorktown to generate profit for the first time.  (Defs. 56.1

¶ 36; Pl. Resp. ¶ 36; *see also* Aff. of Stephan Taylor in Supp. of Defs. Mot. for Summ. J. ("Taylor

Aff."), ECF No. 89, Ex. 13 at Defendants_009563, -9587, -9608.)  The parties do, however, agree

that Yorktown began paying A&P its monthly rent of $7,500.  (Pl. 56.1 ¶ 13; Defs. 56.1 ¶ 36.)

### D.  The Underlying Action

Beginning in January 2000, Yorktown paid a monthly rent of $8,750, instead of the $14,500

delineated in the Modification Agreement.  (Pl. 56.1 ¶ 14; Theisen Decl. Ex. 4 ¶ 31; *id.* Ex. 5 ¶ 13.)

Defendants contend that Yorktown was paying a lower rent amount because of A&P's purported

violation of the "Trade Area Restriction" provided for by the Sublease.[6]  (Defs. Resp. ¶ 14; Theisen

Decl. Ex. 5 ¶ 13; *see also* Taylor Aff. ¶ 53; Defs. 56.1 ¶ 42.)  From 2000 to 2003, Yorktown

continued to pay $8,750, rather than $14,500, and A&P accepted these lower payments.  (Defs. 56.1

¶ 40; *see* Theisen Decl. Ex. 4 ¶ 32.)

A&P's purported passivity eventually ended on or about December 19, 2003 when A&P sent

a demand letter to Yorktown seeking payment of unpaid fixed and additional rent under the

Modification Agreement.  (Pl. 56.1 ¶ 15; Defs. 56.1 ¶ 41.)  After rejecting this demand, on January

---

[6]    Under paragraph 18 of the Sublease, if A&P "open[ed] a store within the area marked 'Trade Area,'" then
Yorktown could reduce the fixed annual rent to an amount equal to $105,000 per year, paid in equal monthly
installments of $8750.00.  (Friedman Aff. Ex. 3 at 10-11.)  Defendants do not address how A&P violated the
Trade Area Restriction.  In any event, A&P disputes Defendants' position, asserting that the Modification
Agreement clearly provides for a rent amount to A&P beyond Yorktown's actual payments.  (Pl. Resp. ¶ 42.)

13, 2004, Yorktown sued A&P in Westchester Supreme Court, seeking, *inter alia*, declaratory

judgment that it did not breach the Sublease under the Modification Agreement (the "Underlying

Action"). (Pl. 56.1 ¶¶ 16-17; Defs. 56.1 ¶ 43; Theisen Decl. Ex. 27 ("2018 Friedman Dep.") 115:21-

116:5.). On February 6, 2004, A&P counterclaimed for breach of contract and payment of unpaid

rent. (Pl. 56.1 ¶ 18; Defs. 56.1 ¶ 44.) While the Underlying Action was pending, Yorktown,

purportedly on the advice of counsel,[7] continued to pay rent to A&P in an amount consistent with

its prior payments. (Defs. 56.1 ¶¶ 45-46; Friedman Aff. ¶ 40.)

In November 2004, the court granted A&P's motion for summary judgment against

Yorktown on two counterclaims related to (1) rent due for April and September 2001, and, February

and March 2002, and (2) unpaid Real Estate Taxes and Common Area Maintenance payments for

the period of 2000-2003. (Pl. 56.1 ¶ 19; Theisen Decl. Ex. 9 at 4.) The court then denied A&P's

motion for summary judgment regarding its counterclaim for payment of the percentage of sales

figures on Turco's sales. (Theisen Decl. Ex. 9 at 4.) On November 22 and 23, 2010, the court

conducted a non-jury trial and took the matter under advisement. (Pl. 56.1 ¶ 20.)

### E. A&P's Bankruptcy and Related Litigation

In December 2010, while a decision was pending in the Underlying Action, A&P and its

affiliates (collectively, the "Debtors") commenced Chapter 11 bankruptcy proceedings. (Theisen

Decl. Ex. 16.) The Debtors were parties to over 700 unexpired leases of non-residential real property

and needed to determine whether to assume and assign, or reject, them. (*Id.* Ex. 17 at 7.) To this

end, Friedman reached an agreement where A&P would assume and assign the Overlease to

---

[7]  A&P objects to Defendants' reference to "advice of counsel" as inadmissible hearsay. (Pl. Resp. ¶ 45.) The
Court disagrees. The statement is offered as circumstantial evidence of Friedman's state of mind and does not
constitute hearsay under FRE 801(c). *See United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017) (concluding
that court erred in precluding defendant from offering evidence of legal advice because the statement was
offered to establish defendant's state of mind, rather than for the truth of the matter asserted).

Yorktown.  (Defs. 56.1 ¶ 55; Friedman Aff. Ex. 1 at Resp. No. 42.)  On June 8, 2011, the Debtors

proposed to the bankruptcy court an assumption and assignment of the Overlease to Yorktown,

pursuant to 11 U.S.C. § 365, in exchange for $100,000 less any cure amounts due to the Overlandlord

(the "Assignment Notice").  (Theisen Decl. Ex. 18 at 5-7.)  The Assignment Notice included

adequate assurance regarding Yorktown's "financial wherewithal and willingness to perform under

the Lease."  (*Id.* at 6.)

On June 17, 2011, after Assignment Notice was filed, A&P's Overlandlord objected and

offered $200,000 in exchange for A&P's rejection of the Overlease.  (Defs. 56.1 ¶ 64; Pl. 56.1 ¶ 23;

Theisen Decl. Ex. 19 at 7-8.)   Citing no objections from its creditors, Debtors accepted the

Overlandlord's offer and, on July 6, 2011, presented the bankruptcy court with a Stipulation and

Order Authorizing Debtors to Reject the Unexpired Lease of Non-Residential Real Property

Between A&P and 380 Downing Drive, LLC (the "Rejection Notice").  (Theisen Decl. Ex. 20 at 1.)

Per the Rejection Notice, the Overlandlord agreed to pay $300,000 (rather than $200,000) and

waived certain of pre-petition and post-petition claims.  (*Id.* at 8-9.)  A&P contends that this deal

provided significantly more consideration than Yorktown's offer.[8]  (Pl. 56.1 ¶ 23.)

**F.  Yorktown Attempts to Preserve the Sub-Sublease**

On August 18, 2011, the bankruptcy court so ordered the stipulation between the Debtors

and the Overlandlord (the "Rejection Order").  (Theisen Decl. Ex. 22 at 9.)  On September 6, 2011,

Yorktown filed an action against the Overlandlord seeking declaratory judgment that the Rejection

Order did not terminate the Sublease (the "Downing Action").  (Defs. 56.1 ¶ 75; Friedman Aff. ¶

63.)  On March 9, 2012, the court determined that the A&P's bankruptcy proceedings terminated

---

[8]   A&P explains that the pre- and post-petition claims against the bankruptcy estate had a value of "no less than
$60,570," such that A&P was obtaining $360,570.80 in benefits.  (Theisen Opp. Decl. Ex. 8 ¶ 13.)  Conversely,
the assumption and assignment of the Overlease would have only provided a benefit of approximately $40,000
because A&P would need to pay a "cure" cost of $60,570.80 to the Overlandlord.  (Pl. Resp. ¶ 67.)

the Sublease and, on April 12, 2012, ordered Yorktown to vacate and turn over possession of the Premises to the Overlandlord.  (Defs. 56.1 ⁋ 76; Friedman Aff. Ex. 14.)  Yorktown's subsequent appeals were unsuccessful.  (Defs. 56.1 ⁋⁋ 78-80; Friedman Aff. Exs. 16-19.)  Thus, because of the Rejection Order, Yorktown lost the Sublease and it sole source of income.  (Defs. 56.1 ⁋⁋ 81-82.)

### G.  The Judgment Against Yorktown

On July 15, 2011, the court in the Underlying Action ruled that Yorktown had breached the Sublease and Modification Agreement and was liable to A&P for unpaid fixed rent, annual percentage rent, equipment rent, and attorneys' fees.  (Theisen Decl. Ex. 11 at 8, 10, 14-15, 16.)  On March 11, 2013, the court set attorneys' fees in the amount of $168,456.62 and entered judgment for A&P for that amount on May 16, 2013.  (Pl. 56.1 ⁋ 30; Defs. 56.1 ⁋ 51.)  On December 2, 2013, the court entered judgment against Yorktown in the amount of $3,709,632.21.  (Pl. 56.1 ⁋ 31; Defs. 56.1 ⁋ 52.)  These judgments totaled $3,878,088.83 (the "Judgment").  (Defs. 56.1 ⁋ 53.)

To date, the Judgment has not been paid, in whole or in part.  (Pl. 56.1 ⁋ 37.)  The parties dispute whether Yorktown's net assets and/or profits would have been sufficient to satisfy the Judgment had the Sublease not been rejected in bankruptcy.  While A&P maintains that Yorktown could not satisfy the judgment even had the Sublease continued, (Pl. 56.1 ⁋ 38; Theisen Decl. Ex. 30 ("Ribaudo Rep.")[9] ⁋ 45 & Ex. 22; *id.* Ex. 28 ("Ribaudo Dep.") 262:14-268:8), Defendants maintain that "with a continued income stream," Yorktown could have paid A&P or at least established a repayment arrangement.  (Defs. Resp. ⁋ 38; Aff. of Leonard Okun in Opp. to Pl.'s Mot. for Summ. J. ("Okun Aff."), ECF No. 97, at ⁋ 19.)

---

[9]     An expert report must be admissible under Federal Rule of Evidence ("FRE") 702.  *See, e.g., Commercial Data Servers, Inc. v Int'l Bus. Mach. Corp.*, 262 F. Supp. 2d 50 (S.D.N.Y 2003) (admitting expert report on summary judgment); *Donnelly v Ford Motor Co.*, 80 F. Supp. 2d 45 (E.D.N.Y. 1999) (excluding expert report because it did not satisfy the admissibility requirements).  As neither party challenges the admissibility of the expert reports in its motions, both parties' expert reports will be considered by the Court.

## II.     Friedman and the Affiliated Companies

### A.  Friedman's Interest in and Relationship with the Affiliated Companies

Friedman was the sole or 90+% owner of each of the Affiliated Companies, except Yellowstone, for which Friedman had a 49% interest.[10]  (Pl. 56.1 ⁋ 39; Defs. 56.1 ⁋ 86.)  Friedman acted as the sole executive officer for each of the Affiliated Companies and was each companies' sole director, to the extent they had any.  (Pl. 56.1 ⁋⁋ 40-41; Nov. 2014 Friedman Dep. 19:19-20:2, 23:11-20, 25:8-20, 27:2-13.)  The parties agree that Friedman performed services for, and actively managed, most of the Affiliated Companies.  (Pl. 56.1 ⁋ 42; Defs. Resp. ⁋ 42.)  As Defendants' expert Paul M. Ribaudo testified, Friedman "certainly control[ed]" the Affiliated Companies and "had the ability to influence them."  (Ribaudo Dep. 35:3-20, 95:24-97:19.)

As it relates to Yorktown, Friedman was responsible for big-picture decisions and delegated day-to-day tasks to Country Markets, Yorktown's management company.[11]  (Friedman Aff. ⁋ 72.) Prior to 2001, Friedman did not draw any salary from Yorktown, but he did so after Yorktown agreed to the Sub-Sublease.  (Defs. 56.1 ⁋⁋ 92, 97; Taylor Aff. Ex. 19.)

### B.  Structure of the Affiliated Companies

#### 1.  *General Structure*

The Affiliated Companies are all "pass-through" entities whose income and losses "pass-through" to Friedman in accordance with his percentage share of profit and loss.  (Pl. 56.1 ⁋ 44.)

---

[10]     The other shareholders were Friedman's father and sister.  (Taylor Aff. Ex. 15 at Defendants_001768, -1770.)

[11]     Defendants aver that Friedman's responsibilities included "meetings with Stephan Taylor and outside accountants to discuss and approve decisions relating to the Premises and Yorktown's finances; communications with A&P and Turco regarding any issues under the Sublease or Sub-Sublease; evaluating other opportunities for leveraging 380 Yorktown's assets, and quarterbacking all litigation matters."  (Friedman Aff. ⁋ 73.)  A&P contend that Friedman's affidavit does not state that he did those things for Yorktown, and that his statement is inconsistent with the record "where he made no mention of any such 'responsibilities.'" (Pl. Resp. ⁋ 91.)  Though A&P correctly notes that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition," *Durant v. A.C.S. State & Local Sols., Inc.*, 460 F. Supp. 2d 492, 494 (S.D.N.Y. 2006), the Court does not find that this factual statement *contradicts* anything in the record.

Each of the Affiliated Companies principal offices were located at 344 White Plains Road, Eastchester, New York 10709 (the "Eastchester Location").  (*Id.* ¶ 45.)  There was only one written lease or sublease for the Eastchester Location, between 344 Food and a third-party landlord; to that end, Country Markets allocated rent for Eastchester Location to some of the other Affiliated Companies.  (Pl. 56.1 ¶ 46; Theisen Decl. Ex. 24 ("Aug. 2014 Friedman Dep.") 44:12-51:2.) Yorktown began as a supermarket, which operated a store on the Premises; it later acted as a sub-sublandlord of the Premises.  (Defs. 56.1 ¶ 107.)  344 Food operated a supermarket in Eastchester, New York.  (*Id.* ¶ 108.)  Yellowstone operated a supermarket in Forest Hills, New York.  (*Id.* ¶ 109.) 6040 LLC owns property in Forest Hills, New York.  (*Id.* ¶ 110.)  Finally, Jestam Int'l is the management company for 6040 LLC.  (*Id.* ¶ 111.)  As further explained below, Country Markets provided services to these companies.  (*Id.* ¶ 112.)

The Affiliated Companies do not elect a board of directors.  (Pl. 56.1 ¶ 54; Nov. 2014 Friedman Dep. 19:6-20:2, 23:4-20, 25:8-20, 27:2-13.)  And to the extent there were annual meetings, it would only consist of Friedman meeting with himself.  (*See* Pl. 56.1 ¶ 50; Aug. 2014 Friedman Dep. 31:22-32:5.)  Stephan Taylor ("Taylor"), Country Markets' Controller, testified that he did not maintain corporate minute books for the Affiliated Companies and had never seen any corporate minute books.  (Pl. 56.1 ¶ 52; Taylor Dep. 12:23-13:8.)

The Affiliated Companies do not memorialize their significant transactions, such as intercompany transfers and loans, in corporate resolutions or written agreements.  (Pl. 56.1 ¶ 53.) Indeed, at his deposition, Ribaudo testified that he had not seen any invoices sent between Country Markets and Yorktown, any document that describe the services provided by Country Markets on behalf of the other Affiliated Companies, or any loan agreement between the Affiliated Companies. (Ribaudo Dep. 79:8-80:14, 89:14-19.)   Ribaudo further testified that some of the Affiliated

Companies prepared combined financial statements.  (*Id.* 199:7-17.)  Certain Affiliated Companies, including 6040 LLC and Jestam Int'l had accounting records that were limited to handwritten journals.  (Pl. 56.1 ¶¶ 56-57; *see generally* Theisen Decl. Ex. 34 at Defendants_003689-003775.)

The parties agree that most of the Affiliated Companies kept and maintained separate bank accounts.  (Defs. 56.1 ¶ 119; Pl. Resp. ¶ 119.)  Yorktown, 344 Food, Yellowstone, Jestam Int'l, and Country Markets all maintained one or more bank accounts at HSBC.  (Defs. 56.1 ¶¶ 120-22, 124-25; Taylor Aff. Exs. 1-3, 5-18.)  Conversely, 6040 LLC maintained a bank account at Westchester Bank.  (Defs. 56.1 ¶ 123; Taylor Aff. Ex. 4.)

## 2. *Country Markets as Management Company*

Prior to the Sublease, Friedman's only ownership interest was in 344 Food.  (Defs. 56.1 ¶ 99; Taylor Aff. ¶ 3.)  In or around 1992, after creating Yorktown, Friedman decided to establish a management company, *i.e.*, Country Markets.  (Defs. 56.1 ¶¶ 100-01.)  Country Markets provided a centralized approach to bookkeeping, payroll, tax planning, and administrative support for multiple entities owned, at least in part, by Friedman.  (*Id.* ¶ 102.)

Country Markets offered several services to the Affiliated Companies.  These services included management/booking services, administrative support, litigation support, payroll services, tax planning services, and bookkeeping services.  (*Id.* ¶¶ 105, 113.)  Country Markets also provided services closely tailored to an entity's needs.[12]  (*Id.* ¶ 114.)  In providing these services, Country Markets was not set up to make a profit, such that it was a zero-balance entity.  (*Id.* ¶ 103.)  Instead, the entities shared in Country Market's expenses, including the overheard costs of their businesses.

---

[12] The parties dispute the extent of service to which Country Markets provided Yorktown.  Defendants maintain that services included "collecting rent from Turco's under the Sub-Sublease; paying rent to A&P under the Sublease; maintaining responsibility for dealing with any issues with A&P under the Sublease; corresponding with Turco's manager to handle tenant issues under the Sub-Sublease; and performing monthly accounting functions."  (Defs. 56.1 ¶ 115; Taylor Aff. ¶ 12.)  A&P contends that this is not supported by, and is in fact inconsistent with, the record.  (Pl. Resp. ¶ 115; *see also id.* ¶ 91.)  Upon a review of the record, the Court concludes that such information is not in tension with any previous representations in the record.

(*Id.*)  Although costs and expenses were shared, Defendants maintain that each company for which Country Markets performed services conducted is own separate business, had its own bank account, and filed its own taxes.  (Defs. 56.1 ¶¶ 106, 126-27, 118; Taylor Aff. ¶¶ 9, 16, 19.)  Nevertheless, Taylor, through Country Markets, handled all financial and banking matters for the Affiliated Companies.  (Taylor Aff. ¶¶ 19-20; Taylor Dep. 5:7-25, 12:4-6.)

The testimony in the record indicates that Country Markets was the only one of the Affiliated Companies that had employees.  (Pl. 56.1 ¶ 47; Theisen Decl. Ex. 26 ("Taylor Dep.") 23:14-24, 25:6-21, 26:12-14, 71:116-19; Aug. 2014 Friedman Dep. 28-24-29:25, 61:12-19, 62:6-10, 63:2-10.)  As Defendants explain, Country Markets provided employees of the Affiliated Companies with a paycheck as part of a centralized management approach.  (Defs. Resp. ¶ 47; Aff. of Stephan Taylor in Opp. to Pl. Mot. for Summ. J. ("Taylor Opp. Aff."), ECF No. 96, ¶ 18.)  The parties dispute whether employees were, at times, transferred to other Affiliated Companies; Defendants characterize any such transfer as only between business divisions.  (Pl. 56.1 ¶ 48; Defs. Resp. ¶ 48.)

### 3.  *Jestam Global and Jestam Int'l*

Jestam Realty was created for a potential business opportunity Friedman was exploring.  (Defs. 56.1 ¶ 178; Friedman Aff. ¶ 83.)  In April 2004, Jestam Realty established a bank account at HSBC and made deposits into the account.  (Defs. 56.1 ¶ 179; Friedman Aff. ¶ 84.)  Friedman decided not to pursue the business opportunity and he withdrew all funds on March 1, 2005.  (Defs. 56.1 ¶¶ 180-81; Pl. Resp. ¶¶ 180-81.)  In 2014, rather than create a new entity, Friedman decided to use the company to pursue a real estate development opportunity in Astoria, New York.  (Defs. 56.1 ¶ 182.)  In connection with this opportunity, Jestam Realty maintained a bank account at Hudson Valley/Sterling, with the last four digits 0101, and a bank account at Wells Fargo, with the last four

digits 6370.  (Defs. 56.1 ⁋ 184; Friedman Aff. Exs. 19-20.)  In 2015, Jestam Realty began operating a real estate development entity.  (Defs. 56.1 ⁋ 185; Friedman Aff. Ex. 21.)

Turning to Jestam Global, although Friedman previously could not recall specifics about the company (2018 Friedman Dep. 133:8-16), he currently maintains that Jestam Global was created in 2013 for unspecified business purposes that never came to fruition.  (Friedman Aff. ⁋ 81.)  The parties dispute whether Jestam Global ever conducted business, whether it maintained a bank account, kept, or maintained financial books and records, and ever filed tax returns.  (Defs. 56.1 ⁋ 176; Pl. Resp. ⁋176.)  Jestam Realty dissolved in 2016.  (Defs. 56.1 ⁋ 177.)

## C.  The Affiliated Companies' Financial Relationship

### 1.  *General Financial Relationship of the Affiliated Companies*

The Affiliated Companies freely shared resources, including using a shared common paymaster that paid bills on their behalf and making loans to one another.  (Pl. 56.1 ⁋ 58; Ribaudo Dep. 226:25-227:9.)  To this end, Yorktown, 344 Food, Country Markets, and Yellowstone—but not 6040 LLC—each used an electronic bookkeeping system known as BRdata.[13]  (Pl. 56.1 ⁋ 59; Defs. 56.1 ⁋⁋ 131-32.)  Certain entities also (or solely) used QuickBooks.[14]  (Pl. 56.1 ⁋ 61.)

Though the entities shared resources, the parties dispute whether the Affiliated Companies acted as a "unified business."  There is no dispute, however, that Country Markets served as a centralized paymaster and paid the Affiliated Companies' expenses—such as legal and professional fees, Friedman's salary, and general and administrative expenses—transferring funds between and

---

[13]    The BRdata was recorded at or near the time of the regularly conducted activity to which the information pertains, by a person with knowledge of the activity to which the information pertains or from information transmitted by a person with knowledge, and kept in the course of regularly conducted business activity. (Theisen Decl. Ex. 6 at Resp. Nos. 134-37.)

[14]    The QuickBooks files produced to A&P are true, correct, and authentic electronic copies of genuine records maintained in QuickBooks.  (Theisen Decl. Ex. 6 at Resp. No. 139.)  The QuickBooks data was recorded at or near the time of the regularly conducted activities to which it pertains, by a person with knowledge of such activities, and was entered and maintained in the regular course of business.  (*Id.* at Resp. Nos. 139-42.)

among them as needed.  (Pl. 56.1 ¶ 63; Theisen Decl. Ex. 6 at Resp. No. 40; Taylor Dep. 20:13-23:4, 42:4-9; Ribaudo Rep. ¶ 66 & Exs. 5-13.)  Although it acted in this capacity, Country Markets did not have a written management services agreement with Yorktown or any of the other Affiliated Companies.  (Pl. 56.1 ¶ 64; Ribaudo Dep. 79:13-80:14.)

   2.  *The Use of BRdata to Manage the Affiliated Companies' Books and Records*

Taylor was involved in the year-end expense allocation process.   When determining allocations, Ribaudo testified that Taylor "considered the taxable income levels of entities as he allocated management fees."  (Ribaudo Dep. 82:17-25.)  Ribaudo further explained that "to the extent that an entity was running at close to a loss, [Taylor] may have refrained from allocating a part of that fee to that entity."  (*Id.* 83:2-8.)  Ribaudo noted that Taylor was acting for Friedman. (*Id.* 84:7-11.)

Taylor primarily used BRdata in preparing this information.  (*See* Defs. 56.1 ¶ 139.)  Each entity in BRdata received its own unique identifying code that indicated every transaction in which it was involved.  (*Id.* ¶ 134; Taylor Aff. ¶ 24.)  BRdata created a separate purchase journal, cash disbursement journal, sales register, cash receipts register, check register, and general ledger for each entity.  (Defs. 56.1 ¶ 135; Taylor Aff. ¶ 25.)  Using this system, Country Markets wrote checks to vendors and allocated the expense to the appropriate entity, creating a "due/to" and "due/from" balance between the entity and Country Market.  (Defs. 56.1 ¶¶ 136-37; Taylor Aff. ¶ 26.)

BRdata's accounting records would purportedly note the indebtedness of one entity to another (Taylor Aff. ¶ 27), year-end allocations of "indirect" expenses like management fees and officers' salaries (*id.* ¶¶ 35-36, 40), loans between entities (*id.* ¶¶ 42-44), and cash swept to Country Markets (*id.* ¶ 30).  At each month's end, Taylor ran a report through BRdata that detailed the monthly balance owed by each entity to Country Markets, the entities' monthly purchase journal

entries, monthly cash disbursement journal entries, monthly sales register entries, monthly cash receipts register entries, and monthly check register entries.[15]  (Defs. 56.1 ¶ 139.)

### 3.  Country Markets' Role in Handling the Affiliated Companies Finances

As noted above, Country Market, as a zero-balance entity and paymaster, used money from the entities to pay its expenses and the expenses of the managed entities.  (Defs. 56.1 ¶ 141; Taylor Aff. ¶ 29.)  Each entity had its bank accounts set up to automatically sweep its funds into one of Country Markets' accounts each day.  (Defs. 56.1 ¶ 142; Taylor Aff. ¶ 30.)  This populated the "due/to" and "due/from" balance, which was then recorded on a general ledger.  (Defs. 56.1 ¶ 144; Taylor Aff. ¶ 30.)  The "due/to" and "due/from" balances also reflected indirect expenses such as management fees and officers' salaries and vendor payments.  (*See* Taylor Aff. ¶¶ 35-36, 40.)

Taylor kept and maintained cash disbursements and cash receipt ledgers for 6040 LLC and Jestam Int'l.  (Taylor Aff. ¶ 33.)  Specifically, from 2001 until approximately 2016, Taylor kept a handwritten check and deposit register for those two companies.  (*Id.* ¶ 34.)  In each of those years, an outside accountant prepared tax returns for 6040 LLC and Jestam Int'l based on the financial records kept in the handwritten ledger.  (*Id.* ¶ 34.)

Country Markets' management fees appeared on tax returns for each entity and were recorded in BRdata as a "general and administrative expense."  (Defs. 56.1 ¶ 153.)  Defendants contend that the management fee was one of the indirect expenses for each entity and represented

---

[15]    Defendants aver that Taylor reviewed and reconciled the entries for each category of balances, receipts, and disbursements in BRdata.  (*See, e.g.*, Defs. 56.1 ¶¶ 140, 152, 164-65.)  Taylor had previously testified that the various expenses and receivables incurred by Country Markets were not annually reconciled, although "the balances [were] equal."  (Taylor Dep. 20:13-22:4 ("There's not a reconciliation but the balances are equal.  So as long as one company on the books of one company is the same as the balance on the books of the other company, its accounted for, but there's not a reconciliation of all the transactions that happen during the year.").)  Because Taylor's current statements are inconsistent statements with his past representations, the Court will disregard them for purposes of this motion.  *See Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996).

each entity's assigned portion of Country Markets' expenses for that year.  (*Id.* ¶ 154.)  This in contrast to an entity's direct expense, which were paid throughout the year.  (*Id.* ¶ 155.)

At year's end, Taylor and Friedman, in consultation with an outside accountant, allocated total expenses, including management fees, among the Affiliated Companies  (Pl. 56.1 ¶ 65; Defs. 56.1 ¶ 156; Ribaudo Rep. ¶ 69; Aug. 2014 Friedman Dep. 58:5-9.)  Allocations of expenses to one Affiliated Company affected allocations to other companies.  (Pl. 56.1 ¶ 66; Ribaudo Dep. 107:12-18:6, 117:15-120:24.)  A&P maintains that there was no seemingly identifiable metric used for determining officer's salary and management fee allocations.  (Pl. 56.1 ¶ 67; Aug. 2014 Friedman Dep. 57:8-58:21; Taylor Dep. 30:5-32:22.)  Rather, Friedman described the expense allocation approach as heuristic, not based on metrics, and not formulaic.  (Pl. 56.1 ¶ 68; Aug. 2014 Friedman Dep. 57:8-58:21; 2018 Friedman Dep. 96:11-110:21; *see generally* Theisen Decl. Ex. 32 ("McKinlay Supp. Rep.") Exs. 2 & 3.)  Defendants clarify, however, that several factors were considered, including Country Markets' expenses, the time and effort devoted to each entity by Country Markets throughout the year, services performed by Country Markets, and tax planning considerations (both as to the Affiliated Companies and Friedman, personally).  (Defs. 56.1 ¶ 158; Defs. Resp. ¶ 67; Okun Aff. ¶¶ 7-13.)  Expenses included employee salaries, insurance, payroll expenses and taxes, supplies, data processing, office repairs, professional fees, and auto expenses. (Defs. 56.1 ¶ 159.)

Another component of the allocation process was Friedman's salary.  Taylor testified that Friedman determined his salary each month and then notified Taylor.  (Taylor Dep. 32:12-22.)  From 2000 through 2011, much of Friedman's salary was allocated to Yorktown.[16]  (Pl. 56.1 ¶ 73; Ribaudo

---

[16]     Ribaudo also testified that to the factors that went into salary allocation.  These factors included "the amount of effort that was put forth by Mr. Friedman," the fact that "Mr. Friedman . . . did not draw a salary on

Rep. Exs. 5-10; Ribaudo Dep. 94:4-102:24.)  Any allocation—or lack thereof—was discretionary. (Pl. 56.1 ₱ 75; Taylor Dep. 80:12-81:14.)  Prior to 2001, Friedman did not draw any salary from Yorktown because of the companies' financial difficulties.  (Defs. 56.1 ₱ 92; Taylor Aff. Ex. 19.) Friedman justified his later salary allocation from Yorktown on this basis.  (Pl. 56.1 ₱ 75; Ribaudo Dep. 102:9-24.)   Friedman also considered corporate earnings when allocating his salary to Yorktown. (Defs. Resp. ₱ 75; Ribaudo Dep. 99:11-25, 100:1-17, 101:12-16, 101:18-19, 102:12-25.)

As it relates to general and administrative costs, Ribaudo testified that he had not seen invoices, management agreements, services agreements, or other "specific documents" that described the services Country Markets provided to the other Affiliated Companies.  (Ribaudo Dep. 79:8-80:14.)  The testimony of Friedman and Taylor indicates that Country Markets did not send invoices or any other documentation to the Affiliated Companies for the services it provided.  (Aug. Friedman Dep. 57:18-58:4; Taylor Dep. 38:14-19.)  There were purportedly no specific documents supporting the expense amount that Country Markets allocated to a specific Affiliated Company. (Taylor Dep. 38:17-19; Ribaudo Dep. 76:8-80:14.)

    *4.  Yorktown's Administrative Costs*

Country Markets served as Yorktown's management company after Yorktown pivoted from operating a supermarket to a real estate company.  (Taylor Aff. ₱ 41.)  Because Yorktown no longer operated a supermarket with daily cash flow, its funds were no longer automatically swept into Country Markets' account each day.  (*Id.* ₱ 41.)  Rather, Taylor transferred funds from Yorktown to Country Markets to cover expenses as needed.  (*Id.* ₱ 42.)

---

[Yorktown]" during the approximately first ten years of its existence, and the "level of income at the entity," *i.e.* whether the entity had the ability to at least sustain the salary.  (Ribaudo Dep. 99:11-100:6.)  Ribaudo later testified that a "considerable factor" was that "Mr. Friedman ha[d] not received or did not take a salary for 10 years while he was working for 380 Yorktown."  (*Id.* 102:12-20; *see also* Taylor Aff. ₱ 39.)

From 2000 to 2011, Yorktown paid approximately $1,874,100 of a total $1,974,100 in officer's salaries allocated by Country Markets to all the Affiliated Companies.  (Pl. 56.1 ¶ 110; Ribaudo Rep. Exs 5-10; McKinlay Supp. Rep. Ex. 2; Ribaudo Dep. 94:7-102:24.)  Additionally, from 2000 to 2011, Yorktown paid approximately $3,060,000 in expense allocations to Country Markets when it had no active operations or employees and a single tenant.  (Pl. 56.1 ¶ 111; McKinlay Supp. Rep. Ex. 2; Ribaudo Rep. Exs. 5, 12.)

Notably, from 1992 through 1999, Country Markets allocated to Yorktown (on average) approximately 1.7% of its total annual revenues to pay for overhead expenses.  (Pl. 56.1 ¶ 112; McKinlay Supp. Rep. Ex. 3; Theisen Decl. Ex. 6 at Resp. No. 52; *id.* Ex. 7 at Resp. No. 153; Ribaudo Rep. Exs. 5, 12.)  However, from 2000 through 2011, Country Markets allocated (on average) approximately 47.4% of its total annual revenues to pay for overhead expenses.  (Theisen Decl. Ex. 29-E; McKinlay Supp. Rep. Ex. 3; Theisen Decl. Ex. 6 at Resp. No. 52; *id.* Ex. 7 at Resp. No. 153; Ribaudo Rep. Exs. 5, 12.)  On this point, Defendants retort that Country Markets only allocated, on average, 20% of total expenses to Yorktown, which was consistent with the allocations to 6040 LLC, the other real estate entity managed by Country Markets.  (Taylor Opp. Aff. Ex. 4.)  In 2012, following the Rejection Order, Yorktown was allocated $0 for officer's salary and $0 for general and administrative expenses; in 2013, it was allocated $150,000 for officers' salary and $105,000 for G&A Costs.  (Pl. 56.1 ¶ 115; Theisen Decl. Ex. 6 at Resp. No. 52; *id.* Ex. 7 at Resp. No. 153.)

**D. Friedman's Use of the Affiliated Companies Funds**

*1.   The HSBC Loan*

The Affiliated Companies and Friedman would book loans between each other without any written documentation or agreed on terms.  (Pl. 56.1 ¶ 81; Ribaudo Dep. 89:14-21; Theisen Decl. Ex. 6 at Resp. Nos. 42, 50, 90; *id.* Ex. 7 at Resp. No. 148.)  These intercompany loans between and

among the Affiliated Companies and Freidman did not have stated interest rates (and, in fact, did not bear interest), repayment schedules, or maturity dates.  (Pl. 56.1 ⁋⁋ 82-83; Theisen Decl. Ex. 6 at Resp. Nos. 43-46; *id.* Ex. 7 at Resp. Nos. 149-52.)  At times, Friedman used funds from other Affiliated Companies to repay loans he took from Yorktown (*see* Ribaudo Dep. 152:19-184:18 & Exs. 5-7); Defendants maintain that such loans were recorded in general ledgers and tax returns for the entities and were paid back (Taylor Aff. ⁋⁋ 16-34; *see also* Ribaudo Rep. ⁋⁋ 128, 132a, 197).  One example of intercompany borrowing and resource sharing came in September 2001, when Yorktown borrowed $1.1 million from HSBC pursuant to a Variable Rate Installment Note (the "HSBC-6040 Loan").  (Pl. 56.1 ⁋ 85; Defs. 56.1 ⁋ 166.)  6040 LLC received the proceeds without a written loan agreement, while Yorktown remained liable for the loan.  (Pl. 56.1 ⁋ 85)

As part of the HSBC-6040 Loan, Yorktown pledged (1) rental income due from Turco's and (2) a $140,000 letter of credit as collateral.  (Pl. 56.1 ⁋ 86; Nov. 2014 Friedman Dep. 58:17-60:1; Taylor Opp. Aff. Ex. 5.)  Friedman also pledged his personal life insurance policy.  (Pl. 56.1 ⁋ 87; Nov. 2014 Friedman Dep. 55:23-56:13.)  The HSBC-6040 Loan was further guaranteed by Jestam Int'l, 344 Food, and Country Markets.  (Pl. 56.1 ⁋ 88; Nov. 2014 Friedman Dep. 54:1-55:19.)  To this end, Friedman signed documents attesting that 344 Food and Jestam Int'l were "financially interested in the affairs [of Yorktown] and expect[ed] to receive a benefit" from the HSBC-6040 Loan.  (Pl. 56.1 ⁋ 89; Aug. 2014 Friedman Dep. 84:18-87:20.)

The HSBC-6040 Loan allowed Friedman, through 6040 LLC, to purchase a fee interest in property located at 71-76 Yellowstone Boulevard, Forest Hills, New York (the "Yellowstone Property").  (Pl. 56.1 ⁋ 90; Theisen Decl. Ex. 6 at Resp. No. 89; Taylor Dep. 50:10-19.)  6040 LLC did not have a set repayment schedule or maturity date for the loan proceeds it received from the HSBC-6040 Loan.  (Pl. 56.1 ⁋ 92; Theisen Decl. Ex. 6 at Resp. Nos. 92, 94.)  Although Yorktown

19

made all or nearly all principal and interest payments due on the HSBC-6040 Loan, its accounting ledgers did not reflect regular repayments from 6040 LLC related to the HSBC-6040 Loan. (Pl. 56.1 ₱ 93; Theisen Decl. Exs. 29-c; *id.* Ex. 31 ("McKinlay Rep.") at 14.)  6040 LLC allegedly repaid Yorktown for the use of the HSBC-6040 Loan proceeds by paying certain expenses on Yorktown's behalf.  (Pl. 56.1 ₱₱ 95, 99; Theisen Decl. 6 at Resp. No. 95; Ribaudo Dep. 227:21-28:19.)  In other words, Yorktown purportedly traded its receivable due from 6040 LLC for 6040 LLC's receivable due from Country Markets and then booked certain management fees due to Country Markets against that receivable.  (Ribaudo Dep. 230:18-35:13.)  Neither 6040 LLC nor Yorktown incurred interest expenses for the use of the HSBC-6040 Loan proceeds.  (Pl. 56.1 ₱ 96; McKinlay Rep. at 14; Theisen Decl. Ex. 29-A.)  The HSBC-6040 Loan was repaid in full by December 31, 2015.  (Defs. 56.1 ₱ 168; Taylor Aff. ₱ 46.)

The Yellowstone Property was also financed with $500,000 from HSBC to 344 Food, which transferred the proceeds to Friedman in June 2001 and recorded the transfer on its books as a loan; Friedman thereafter sent the funds to 6040 LLC.  (Pl. 56.1 ₱ 100; Taylor Dep. 50:11-52:16.)  Taylor testified that this transaction was "[f]or [Friedman] to purchase a piece of the [Yellowstone] property," although he later clarified that he meant 6040 LLC.  (Taylor Dep. 50:14-19.)

In 2013, Yorktown reaffirmed and modified its contractual obligation to HSBC to extend the time within which Yorktown had to pay off the loan.  (Pl. 56.1 ₱ 101; Theisen Decl. Ex. 35; Taylor Opp. Aff. ₱ 38.)  Yorktown recorded its debt service obligations to HSBC between 2011-2014 and continued to make some payments to HSBC; other payments to HSBC appear to have been made by Country Markets.  (Pl. 56.1 ₱ 102; Exs. 29-C & 29-D.)  Defendants explain that Country Markets made payments because, by 2012, Yorktown was no longer generating income due to losing the Sublease.  (Defs. Resp. ₱ 102; Taylor Opp. Aff. ₱ 42.)

By December 2011, Yorktown's cash account had an ending balance of $21.64. (Theisen Decl. Ex. 36 at Defendants_000427.) Although Yorktown's bank accounts showed deposits of $79,432.57, $43,657.83, and $87,651.66 between January 2012 and March 2012, there were corresponding withdrawals in those same amounts, such that the total asset amount remained at $21.65. (Aff. of Jennifer B. Zourigui in Opp. to Pl. Mot. for Summ. J. ("Zourigui Opp. Aff."), ECF No. 94, Ex. 7 at Defendants_000423, -421, and -419.) BRdata indicates that in December 2012, a $1.1 million "loan receivable" on Yorktown's books was wiped away by a non-cash entry reflecting a $810,000 loan due to Country Markets and a payment in capital. (Pl. 56.1 ¶ 98; Theisen Decl. Ex. 29-B.) This entry was reversed by December 2013. (Defs. Resp. ¶ 98; Ribaudo Rep. ¶¶ 133-38.)

### 2. Friedman's Distributions and Use of Funds

Friedman supplemented his salary with distributions from the Affiliated Companies. (Pl. 56.1 ¶ 104; Ribaudo Dep. 149:12-20.) The parties appear to agree that, from 1993 through 2011, Yorktown made approximately $31,67,200 in distributions and loans to Friedman.[17] (McKinlay Supp. Rep. Exs. G-1, G-2; Ribaudo Rep. Exs. 14, 16.) Other transactions included (1) from 2001 to 2015, 344 Food distributed and loaned Friedman proceeds totaling $1,907,598, (2) from 2004 to 2015, 6040 LLC made distributions, loans, or other payments to Friedman and the JF Trust totaling $1,268,100, and from 1993 to 2014, and (3) Country Markets made distributions, loans, or other payments totaling $1,707,958. (Ribaudo Rep. Ex. 14.) Separately, Yellowstone paid $290,000 to Friedman's sister and father, and, from 2001 to 2012, paid $377,000 in distributions to Friedman. (Id.)

---

[17] The parties dispute whether, from 1992 through 2015, Friedman caused the Affiliated Companies to make approximately $8,337,856 in distributions and loans to himself or the "JF Trust." (Pl. 56.1 ¶ 107; Defs. Resp. ¶ 107.) A&P points to Exhibit 14 of the Ribaudo Report, which reflects these alleged "distributions" and "loans." (Ribaudo Rep. Ex. 14.) Defendants contend, however, that A&P does not distinguish between loans and loan repayments and argue that payments to the JF Trust were, in fact, repayments from 6040 LLC for a loan made on March 10, 2014. (See id. at n.4; Defs. Resp. ¶ 107; Ribaudo Rep. ¶ 132a.)

In addition to these distributions, from 1992 to 2011, Yorktown transferred property to Friedman in the amount of $3,077,200. (Pl. 56.1 ¶ 124.) Of that total, $2,285,100 was made after the Modification Agreement, and $1,055,900 was made after the Underlying Action was filed. (Theisen Decl. Ex. 6 at Resp. No. 41; Theisen Decl. Ex. 7 at Resp. No. 147.) Defendants contend these transfers were a combination of loans, loan repayments, paid-in capital repayments, and distributions. (Defs. Resp. ¶ 124; Ribaudo Rep. ¶¶ 105-10, 117, 195-200.) Other funds received and used by Friedman included approximately $350,000 to develop property located at 29-10 Broadway in Astoria, New York. (Theisen Decl. Ex. 6 at Resp. Nos. 97-98; McKinlay Rep. at 22.)

Defendants maintain that distributions were only made when an entity had positive equity and that all shareholder loans from Yorktown to Friedman were repaid by 2009. (Defs. Resp. ¶¶ 104, 106; Ribaudo Rep. ¶¶ 78, 130-31, 194-200, 208-09.) Defendants dispute A&P's characterization of certain alleged distributions, noting that although BRdata coded certain transactions as "distributions" or "loans," those transactions were, in fact, loan repayments. (Defs. Resp. ¶¶ 125-27; Ribaudo Rep. ¶¶ 124-132d.) Defendants also argue that certain of the distributions were simply management-fee payments to Country Markets. (Ribaudo Rep. ¶ 132b.)

Besides distributions and loans to himself, Friedman has also acknowledged that his family enjoyed extensive personal use of the Affiliated Companies' assets. (Theisen Decl. Ex. 10 at 2.) Specifically, in its *Pendente Lite* Order issued as part of Friedman's 2007 divorce proceeding, the court explained that Friedman's wife "aver[red] that the stores [owned by Friedman] generate large amounts of cash, which was used to pay for every conceivable type of family expense, including household renovations or repairs." (*Id.*) Friedman's wife "further aver[red] that [Friedman] brought food for the family home from the stores, paid for expenses such as family computers through the businesses, and utilized repairmen employed by the business to perform household repairs." (*Id.*)

22

Meanwhile, Friedman represented that "his family still has the benefit of [] business perquisites, in the form of payment of various forms of insurance, automobile usage and fuel, cellular telephones, food at cost, and some travel and entertainment." (*Id.* at 2-3.)

      3.  *Friedman's Preservation of Assets for a Potential Judgment*

As noted above, Friedman had control of Country Markets' expense allocations. (Pl. 56.1 ¶ 135.) Even so, after being put on notice of A&P's claim for unpaid rent in December 2003, Friedman took no steps to preserve Yorktown's assets for a potential judgment. (Pl. 56.1 ¶ 133; 2018 Friedman Dep. 116:15-117:14.) Friedman also did not take any actions to preserve Yorktown's assets after summary judgment was granted in Underlying Action on two of A&P's counterclaims. (Pl. 56.1 ¶ 134.) Defendants ultimately dispute Friedman's need to do so.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

**I.    Piercing the Corporate Veil**

Under the doctrine of veil piercing, courts may "'disregard the corporate form' and hold a third party liable for a corporate entity's debts in certain circumstances." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 401 (S.D.N.Y. 2015). A party seeking to pierce the corporate veil must establish two elements: "(1) the owner[] exercised complete domination of the corporation in respect to the transaction attacked; and (2) [] such domination was used to commit a fraud or wrong against the plaintiff." *Morris v. N.Y.S. Dep't of Taxation and Fin.*, 82 N.Y.2d 135,

141 (1993).  Both elements must be met to pierce the corporate veil.  *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1052 (2d Cir. 1997) ("[T]he element of domination and control never was considered to be sufficient of itself to justify the piercing of a corporate veil. Unless the control is utilized to perpetrate a fraud or other wrong, limited liability will prevail.").

Although the "veil-piercing standard is broadly worded and grants substantial equitable discretion to the court," *Shantou Real Lingerie Mfg. Co., Ltd. v. Native Grp. Int'l, Ltd.*, No. 14-cv-10246 (RWL), 2019 WL 1447615, at *5 (S.D.N.Y. Mar. 15, 2019) (quoting *Am. Federated*, 126 F. Supp. at 402), "[t]hose seeking to pierce a corporate veil . . . bear a heavy burden," *TNS Holdings, Inc. v. MKI Securities. Corp.*, 92 N.Y.2d 335, 339 (1998).  Indeed, "New York's demanding veil-piercing standard serves in part to ensure that courts do not mistake that type of permissibly advantageous incorporation for inequitable abuse." *Am. Federated*, 125 F. Supp. 3d at 403.  The decision to pierce the corporate veil "will necessarily depend on the attendant facts and equities." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 F. App'x 23, 28 (2d Cir. 2017) (quoting *Morris*, 82 N.Y.2d at 141).

Here, both parties move for summary judgment on A&P's veil piercing claim.  A&P contends that the undisputed facts reveal that, as a matter of law, Friedman dominated and controlled the Affiliated Companies in a manner that wronged A&P by rendering Yorktown unable to pay any portion of the Judgment.  (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl. Mot."), ECF No. 82, at 2-19.)  A&P maintains that it is appropriate to pierce Yorktown's corporate veil and hold Friedman and the other Affiliated Companies liable for the entirety of the Judgment.  (*Id.*)  Defendants counter that, as a matter of law, the Court cannot conclude that Friedman exercised complete domination over the Affiliated Companies or used any purported domination to shield Yorktown from creditors.  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs. Mot."), ECF

No. 85, at 6-18.)  As detailed below, A&P has established that Friedman dominated Yorktown and the Affiliated Companies, but questions of material facts remain as to whether that dominion wronged A&P.  The Court addresses both prongs of the veil-piercing analysis below.

### A. Complete Domination Analysis

To assess complete domination, courts typically consider the following factors:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

Notably, "[c]ourts are not required to find that every factor is present, and no one factor is dispositive." *Shantou*, 401 F. Supp. 3d at 440 (citing *N.Y.S. Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 225 (2d Cir. 2014)); *see also Sentry v. Brand Mgmt. Inc.*, 120 F. Supp. 3d 277, 288 (E.D.N.Y. 2015) ("[I]t is not required that every single factor weigh in favor of piercing the corporate veil—a district court need only find that, as a matter of law, 'the balance of *Passalacqua* factors weighs in favor of either party,' on proven facts not contradicted by other admissible proof."). Although courts "must avoid an over-rigid 'preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history" when dealing with a closely held corporation, *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 17-18 (2d Cir. 1996), the *Passalacqua* factors will nevertheless remain relevant.  *See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs.*, 386 F. Supp. 2d 461, 471 (S.D.N.Y. 2005); *see*

*also Statharos v. N.Y.C. Taxi and Limousine Comm'n*, 198 F.3d 317, 325 n.1 (2d Cir. 1999) ("[T]he mere fact that the companies are small, closely-held corporations does not justify piercing the veil, but it suggests the possibility that the corporations might be alter egos of an individual or a family— a possibility that would need to be investigated through attention to the factors listed in *Passalacqua,* including undercapitalization.").

Here, even according some leniency to the Affiliated Companies' purported closely held status, a review of the undisputed material facts establishes that Friedman maintained complete domination over Yorktown and the Affiliated Companies.[18]   As an initial matter, the record is brimming with undisputed evidence of a non-economic relationship.   For example, each of the Affiliated Companies shared a single office at the Eastchester Location under one lease for which rent was allocated amongst the Affiliated Companies and there is no indication that corporate formalities were observed as between any given company.   (Pl. 56.1 ¶¶ 45-46, 50-54; Taylor Dep. 12:23-13:8, 18:3-20:3; *see generally* Ribaudo Dep. 79:13-80:14, 89:14-21; Nov. 2014 Friedman Dep. 19:6-20:2, 23:4-20, 25:8-20, 27:2-13.)   The undisputed evidence also reveals that Affiliated Companies largely were interdependent units.   Although, Defendants note, each of the Affiliated Companies maintained separate bank accounts—primarily at HSBC—and filed separate tax returns

---

[18]   A&P argue that Defendants are estopped from challenging several key alter ego factors due to certain observations from the summary judgment opinion in the Downing Action.  (Pl. Mot. 6.)  Specifically, A&P invokes the doctrines of judicial estoppel and collateral estoppel.  Neither is applicable here.  As to judicial estoppel, the doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 127 (2d Cir. 2016). Here, judicial estoppel is not applicable for the simple fact that the representations A&P points to were not part of a successful argument by Yorktown; rather, they, were observed by the court in denying Yorktown's motion for summary judgment.  Regarding collateral estoppel, that doctrine is available where "the issues in both proceedings [are] identical, (2) the issue in the prior proceeding [was] actually litigated and actually decided, (3) there [was] a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated [was] necessary to support a valid and final judgment."  *Faulkner v. Nat'l Geo. Enters., Inc.*, 409 F.3d 26, 37 (2d Cir. 2005).  As denial of a motion for summary judgment is not a final judgment, *Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc.*, 23 F.3d 55, 59 (2d Cir. 1994), collateral estoppel is not appropriately applied to the Downing Action court's observations in denying Yorktown's motion for summary judgment on the Overlandlord's alter ego claim.

(Defs. 56.1 ¶¶ 118-126), it is undisputed that they, *inter alia*, (1) shared a common management company and paymaster, Country Markets, who provided management and/or booking keeping services with no written management agreement (*id.* ¶ 105; Pl. 56.1 ¶¶ 63-64); (2) often combined financial statements (Pl. 56.1 ¶ 55; Ribaudo Dep. 199:7-17); and (3) had employees paid by the same paymaster under corresponding wage allocations by Country Markets (Pl. 56.1 ¶ 48; Defs. Resp. ¶¶ 47-48; Taylor Opp. Aff. ¶¶ 18-28).  And Friedman was at the heart of these operations.  Indeed, the undisputed evidence establishes that Friedman acted as either the sole, or a controlling, owner of each of the Affiliated Companies, was the chief executive and only director for each of the Affiliated Companies, and otherwise had an active and commanding role in the affairs of almost all of the companies.  (Pl. 56.1 ¶¶ 39-43; Defs. 56.1 ¶ 86; *see also* Ribaudo Dep. 35:3-20, 95:25-97:19.)

In addition to noneconomic relatedness, the undisputed record further establishes the Affiliated Companies' economic relatedness and Friedman's dominating control over their financials.  To begin, the record reveals that money flowed freely among the various entities under Friedman's control.  For example, there is undisputed evidence that Affiliated Companies guaranteed debts and transferred funds amongst each other without any written documentation, repayment schedules, or stated interest rate.  (*See* Pl. 56.1 ¶¶ 82-83.)  One such example was the HSBC-6040 Loan, which was made by Yorktown for 6040 LLC's benefit, guaranteed by several of the Affiliated Companies and Friedman.  (Pl. 56.1 ¶¶ 85-89, 99; Defs. 56.1 ¶ 169.)

The Affiliated Companies reliance on Country Markets provides further evidence of economic interrelatedness.  Specifically, the evidence establishes that Country Markets, which was not set up to make a profit, aggregated various costs and expenses for the Affiliated Companies— such as salary and general and administrative costs—and then allocated those expenses at the end of the year.  (Pl. 56.1 ¶ 65; Defs. 56.1 ¶¶ 103-104, 154.)  Although Defendants do note that direct

expenses were purportedly paid when accrued, the testimony in the record reveals that Country Markets did make end-of-year allocations that were not seemingly tied to any specific services performed, not computed using any identifiable metrics, and otherwise subjected to Friedman's discretion and approval.  (*See* Ribaudo Dep. 84:7-11, 120:10-24; Aug. 2014 Friedman Dep. 57:8-58:21; 2018 Friedman Dep. 96:11-110:21; Taylor Dep. 30:5-32:22, 66:3-67:14, 80:16-81:14.)  The record even indicates that considerations unrelated to services, such as entity tax planning and Friedman's cost of living and expenses, were among the factors Taylor, Friedman, and their accountants used to determine Country Market's expense computations and allocations to the Affiliated Companies.  (Defs. 56.1 ⁋ 98; Pl. 56.1 ⁋⁋ 69-70; Friedman Aff. ⁋ 79.)

Regarding Friedman's economic control and benefit, there is no serious dispute that Friedman caused some distributions and loans to be paid out from the Affiliated Companies' assets to himself and his trusts at various points (Pl. 56.1 ⁋⁋ 104, 106, 108-09), although there is some dispute about the nature of certain transactions coded in BRdata and whether they reflect transfers or mere loan repayments (*see, e.g.*, Defs. Resp. ⁋ 107).  The record also plainly establishes that Friedman's control allowed him to use funds in connection with obtaining benefits for himself and certain entities, such as property investment opportunities.  (*See, e.g.*, Pl. 56.1 ⁋ 90; Taylor Dep. 50:10-19.)  There are also instances in the record of Friedman comingling personal and corporate expenses; again, as noted above, Friedman considered his own personal expenses and tax considerations when assessing the salary that he drew from the Affiliated Companies and there is some indication that Friedman has, in the past, freely used the Affiliated Companies' assets for personal purposes.  (*See* Friedman Aff. ⁋ 79; Theisen Decl. Ex. 10 at 2.)  And as further evidence of Friedman's economic intertwinement, the income and losses of the Affiliated Companies passed through to Friedman.  (Pl. 56.1 ⁋ 44; Defs. Resp. ⁋ 44.)

In sum, A&P has established the interrelatedness of the Affiliated Companies and their complete domination by Friedman.  To be sure, certain factors, namely inadequate capitalization, remain materially disputed in the record.  (*See* Defs. Mot. 6-8.)  This dispute, however, does not, in this Court's view, disturb the overall balance of the undisputed facts under the *Passalacqua* factors that point to the Affiliated Companies operating as the unified businesses of the alleged dominator, *i.e.*, Friedman.  *See Shantou*, 401 F. Supp. 3d at 443 (rejecting argument that there could be no domination and control if company conducted legitimate business, as plaintiff was "not required to show that [the company] conducted no legitimate business in order for the Court to find that [defendant] was [the company's] alter ego").

The Court now turns to whether this domination was used to commit a wrong.

**B. Use of Domination to Commit a Wrong Analysis**

"Although a showing of complete domination is 'the key to piercing the corporate veil,' the party seeking to pierce the corporate veil must also fulfill the second requirement by demonstrating: 1) the existence of a wrong or unjust act toward that party, and 2) that the act caused that party's harm." *JSC Foreign*, 386 F. Supp. 2d at 465.  This requires a showing that, through the domination of the corporation," the owner "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party." *Id.* at 465 (quoting *Morris*, 82 N.Y.2d at 142).

A plaintiff is "not required to prove actual fraud in order to pierce the . . . corporate veil." *Ridge Clearing & Outsourcing Sols., Inc. v. Khashoggi*, No. 07 Civ. 6611(RJH), 2011 WL 3586455, at *10 (S.D.N.Y. ) (quoting *Lederer v. King*, 214 A.D.2d 354, 354 (2d Dep't 1995)).  What matters is that the domination and control of the corporation "resulted in wrongful or inequitable consequences." *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998).  Conduct that is simply "motivated by a desire to render the subsidiary [or entity] judgment proof" constitutes a fraud

or wrong for purposes of this analysis.  *See Feitshans v. Kahn*, No. 06 Civ. 2125(SAS), 2007 WL 2438411, at *5 (S.D.N.Y. Aug. 24, 2007) ("For example, courts have found that the diversion of a dominated entity's funds into the dominating party's personal bank accounts, while on notice of a potential judgment against the entity, constitutes dissipation of assets that could otherwise have been used towards satisfying plaintiff's judgment."); *see also Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 378 (E.D.N.Y. 2013) (explaining that "[i]f a corporation is not able to pay its debts to the plaintiff as a result of the owner's domination that is an inequitable consequence sufficient to meet the 'fraud or wrong' prong.").  Similarly, an inequitable result may arise where "the controlling party creates a judgment-proof 'dummy' corporation as a means to incur, but ultimately avoid paying, personal obligations." *Am. Federated*, 126 F. Supp. 3d at 404 (citing cases as examples).

Here, the parties agree that, to date, Yorktown has failed to satisfy the judgment against it in the Underlying Action.  (Pl. 56.1 ₱ 37; Defs. Resp. ₱ 37.)  And, as explained above, the Affiliated Entities, including Yorktown, acted in a unified capacity under Friedman's control.  Summary judgment for either party as to A&P's veil-piercing theory, however, is not warranted at this time.  Specifically, there is a genuine dispute of material facts about whether Friedman used his complete dominion of Yorktown to render Yorktown insolvent or judgment proof.

For example, evidence in the record reveals that from 1992 through 1999, Yorktown was allocated 1.7% of its total annual revenues to pay for overhead expenses, while from 2000 through 2011, after Yorktown had entered into the Sub-Sublease, the allocations jumped to 47.4%.  (*See* Pl. 56.1 ₱₱ 112-14, 136; McKinlay Supp. Rep. Ex. 3; Ribaudo Rep. Exs. 5, 12.)  But as Defendants, relying on their expert, note, those allocations were consistent as between entities of the same type and the allocations remained consistent both before and after Yorktown filed the Underlying Action.

(Ribaudo Rep. ¶¶ 186(d)-(e).)  As such, although it may be the case that there was no set formula as to how allocations were determined, there is a dispute about whether such allocations were done to render Yorktown judgment proof or insolvent.

A similar material dispute exists as to the intentions of the underlying loan transactions to which A&P points.  A&P contends that the undocumented loans between the Affiliated were effectively a mechanism for Friedman to divert funds from Yorktown.  (Pl. Mot. 14.)  In support, A&P primarily relies on the HSBC-6040 Loan.  (Pl. 56.1 ¶ 85; Pl. Mot. 16-17.)  On this point, there is evidence and testimony that indicates that Yorktown lacked any ownership interest, did not receive any interest payments, and did not have a schedule of repayments, all of which would traditionally appear in an arms-length transaction.  (*See* Pl. 56.1 ¶¶ 90-93.)  A&P further avers that, after the Judgment was rendered, Yorktown reaffirmed its contractual obligations to HSBC for payment of the HSBC-6040 Loan.  (*Id.* ¶ 101.)  In response, Defendants point to evidence in the record suggesting that loans between the Affiliated Companies were recorded on general ledgers and tax returns, that these loans were repaid, and that, after 2008, there was no loan balance between Friedman and Yorktown in particular.  (Ribaudo Rep. ¶¶ 62, 64, 80.)  As to the HSBC-6040 Loan, Defendants maintain that the loan was taken in 2001 for a specific business purpose, several years prior to the initiation of the Underlying Action, and that there was sufficient consideration to support it, *i.e.*, the management fee allocations to 6040 LLC.  (Defs. 56.1 ¶ 166; Defs. Mot. 17; Defs.' Mem. of Law in Opp. to Pl. Mot. ("Defs. Opp."), ECF No. 92, at 9-10.)  All together, there remains factual issues as to whether the loan and loan repayment schemes were undertaken to frustrate the Affiliated Companies' ability to meet debt obligations.  *Cf. Am. Federated*, 126 F. Supp. 3d at 411.

Finally, there is a genuine dispute as to what caused Yorktown's illiquidity.  As previously noted, A&P points to evidence in the record that supports the view that Friedman exercised his

control of the Affiliated Companies to siphon assets through improper expense allocations, no-interest loan agreements, and distributions to himself.  (Pl. 56.1 ¶¶ 81-83, 85-86, 90-98.)  A&P's own expert maintains that it was Friedman's conduct and his control of funds that left Yorktown with inadequate capitalization even before the Judgment (as early as 2011).  (McKinlay Rep. 9-12; Aff. of Jennifer B. Zourigui in Supp. of Defs. Mot. for Summ. J., ECF No. 90, Exhibit 6 at 97:3-99:24.)  But, as Defendants explain, there is countervailing evidence that Yorktown had positive equity from 2000 until the termination of the Sub-Sublease and that the inadequate capitalization only arose upon A&P's bankruptcy.  (*See, e.g.*, Ribaudo Rep. ¶¶ 78, 80-82, 86-89.)  Given the central role of the bankruptcy proceedings to Yorktown's liquidity and the above-noted material factual disputes, the Court is unable to conclude at this time that, as a matter of law, it was Friedman's control of Yorktown and the Affiliated Companies' assets that rendered Yorktown illiquid by the time the Judgment came due.

In sum, neither party has met its burden regarding the appropriateness of resolving the veil piercing issue on summary judgment.  The above issues make clear that reasonable triers of fact could reach differing conclusions as to whether the evidence establishes that Friedman's exercise of control over the Affiliated Companies is what precluded Yorktown from satisfying the Judgment. Accordingly, the Court DENIES A&P's motion for summary judgment on its veil piercing claim and Defendants' motion for summary judgment to dismiss A&P's veil piercing claim.

## II.   Fraudulent Conveyance

Under New York law, there are several types of conveyances, defined under NYDCL §§ 273, 273-a, and 276, that can be considered fraudulent and therefore recoverable by a creditor.[19]

---

[19]   On December 6, 2019, New York State enacted the "Uniform Voidable Transactions Act," thereby repealing and replacing certain provisions related to fraudulent conveyances (including NYDCL §§ 273, 273-a, and 276).

These "conveyances fall into two distinct categories: constructively fraudulent conveyances . . . and actual[] fraudulent conveyances." *Am. Federated*, 126 F. Supp. 3d at 400. A&P contends that, as a matter of law, they have established that both actual and constructive fraudulent conveyances that must be avoided. (Pl. Mot. 20-21.) Conversely, Defendants maintain that the evidence does not support a finding any fraudulent conveyances. (Defs. Mot. 18-21.) Defendants also aver that A&P's actual fraudulent conveyances claims are time barred. (*Id.* at 22-24.) The Court explores the parties' contentions as to both forms of fraudulent conveyances below.[20]

### A. Actual Fraudulent Conveyance under § 276

Under NYDCL § 276, "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent[.]" "Only an actual intent to hinder and delay need be established, not an actual intent to defraud." *United States v. Carlin*, 948 F. Supp. 271, 277 (S.D.N.Y. 1996) (citing *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 631 F. Supp. 335, 346-47 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987)).

Where actual intent is proven, "the conveyance will be set aside regardless of the full adequacy of consideration exchanged." *Cadle Co. v. Newhouse*, No. 01 Civ. 1777(DC), 2002 WL 1888716, at *5 (S.D.N.Y. Aug. 16, 2002), *aff'd*, 74 F. App'x 152 (2d Cir. 2003) (quoting *RTC Mortg. Trust 1995-S/n1 v. Sopher*, 171 F. Supp. 2d 192, 2000 (S.D.N.Y. 2001)). But proving actual intent

---

*See* 2019 N.Y. Laws, ch. 580 (A5622). Although the amendment has an effective date of April 4, 2020, the amendment "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date. *Id.* § 7; *see also Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. 2020) ("We briefly note that all sections of the NYDCL relevant to this appeal have been repealed and replaced—effective April 4, 2020—by an act of the New York legislature approved on December 6, 2019. The new provisions, however, will 'not apply to a transfer made or obligation incurred before' the act's effective date, "nor shall [they] apply to a right of action that has accrued before [that] effective date.'" (citations omitted)). As result, this change in law does not impact the Court's analysis.

[20] As a genuine dispute remains as to whether to pierce the corporate veil, the Court only addresses A&P's fraudulent conveyance claims as applied to Yorktown. *See Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 736 (S.D.N.Y. 1993) ("The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance[.]"). Should the corporate veil ultimately be pierced, however, the other Affiliated Companies' transactions could also be at issue. *See Wm. Passalacqua*, 933 F.2d at 142-43 ("[T]he alter egos are treated as one entity.").

is understandably quite difficult through direct proof.  *See In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) ("Fraudulent intent is rarely susceptible to direct proof.").  As a result, courts often look to the existence of certain "badges of fraud" as means of "establish[ing] proof of fraudulent intent." *RTC Mortg.*, 171 F. Supp. 2d at 201.  These badges include

> (i) a close relationship between the parties to the transaction; (ii) a questionable transfer not in the ordinary course of business; (iii) inadequacy of consideration; (iv) the transferor's knowledge of the creditor's claim and his inability to pay it; and (v) retention of control of the property by the transferor after the conveyance.

*Id.* (citing *Wall Street Asscos. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999); *Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998)).  "[T]he flip side of these badges of fraud is that their absence . . . would constitute evidence that there was no intent to defraud." *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003).  Here, for many of the same reasons militating against granting summary judgment on the veil piercing issue, the Court must conclude that there is a genuine dispute of material fact as to whether Defendants had actual intent to hinder, delay, or defraud A&P.

A&P, of course, maintains that the badges of fraud underlie the allocations, loans, and distributions that were triggered by Friedman and the Affiliated Companies.  For example, A&P points to evidence that many of the intercompany loans were undocumented, did not bear interest, and were subject to other entities' cash flows for repayment, such that there is no evidence in the record that would justify the payments made at any given point.  (Pl. 56.1 ⁋⁋ 64, 67-79, 81-83; Pl. Statement of Additional Facts ("Pl. Add."), ECF No. 98, ⁋ 6.)  A&P cites millions of dollars of transfers in the form of management fees and salary allocations, intercompany loans and repayments, and distributions, which purportedly rose once Yorktown transitioned from a supermarket operator to a rent collector in 1999.  (Pl. 56.1 ⁋⁋ 112-13, 124-29.)  As it relates to any loan repayment, A&P contends that a significant portion of those transfers occurred after the commencement of the Underlying Action.  (Pl. Mot. 23; Pl. 56.1 ⁋ 124.)  Finally, A&P maintains Friedman used his

overlapping control of the Affiliated Companies to ensure that a given transaction or allocation could reduce the amount of assets available to pay obligation, particularly for Yorktown.  (*See* Pl. 56.1 ¶¶ 66, 70, 99.)

Defendants primarily challenge A&P's contention that Friedman's course of conduct regarding management fees, salary allocations, and loan and loan repayments reflect an intent to defraud.  They initially retort that many of the at-issue transactions took place in the ordinary course of business, were duly recorded in ledgers and tax returns (such that there was no secrecy), and did not have the effect of depriving any entity of adequate capitalization.[21]  (Defs. Opp. 17, 19.)  To this point, there is evidence in the record to support the view that the management fee and salary allocations have been consistently applied over time, regardless of whether there was a judgment against Yorktown.  (*See* Taylor Opp. Aff. Ex. 4; Ribaudo Rep. ¶¶ 186(d)-(e); Taylor Aff. Ex. 19.) And there is evidence that, although management fee allocations did increase for Yorktown after it was converted into a real estate entity, the percentage of allocation was consistent between similarly situated Affiliated Companies.   (Ribaudo Rep. Exs. 5-10.)   Defendants' proffered evidence ultimately raises a question as to the general propriety and intent of the post-counterclaim transactions.  Although the record does reflect evidence of certain badges of fraud, namely the closeness of the parties and Friedman's general domination of the Affiliated Companies, the evidence of consistency counters those badges, thereby precluding summary judgment, particularly under a clear and convincing standard.

The Court concludes, however, that there is no issue of triable fact regarding whether A&P's claims are time barred.  A claim under NYDCL § 246 must be brought within six years of the fraud or conveyance, or within two years of discovery, whichever is longer.  *Sullivan v. Kodsi*, 373 F.

---

[21]     Defendants specifically focus on the alleged December 2012 transaction that was eventually reversed in 2013. (Defs. Opp. 17 (citing Ribaudo Rep. ¶¶ 133-47).)

Supp. 2d 302, 308 (S.D.N.Y. 2005) (citing N.Y. C.P.L.R. §§ 203(g), 218(8)).  "In New York, 'the issue of when a plaintiff, acting with reasonable diligence, could have discovered an alleged fraud turns upon whether the plaintiff possessed knowledge of facts from which he could reasonably have inferred the fraud"; mere suspicion is not enough.  *Saphir Int'l, SA v. UBS PaineWebber Inc.*, 25 A.D.3d 315, 315-16 (1st Dep't 2006) (quoting *Schmidt v. McKay*, 55 F.2d 30, 37 (2d Cir. 1997).)

Defendants maintain A&P should have been aware of purportedly fraudulent conveyance when it filed its adequate assurance information during the bankruptcy proceedings.  (Defs. Mot. 23.)  Defendants take the position that, at the time its filing, A&P could have demanded that Yorktown provide it with financial records.  (*Id.*)  A&P counters that this argument fundamentally misunderstands the bankruptcy process, and that it had no reason to go beyond lease documents to show adequate assurance given that lease document revealed that the Sub-Sublease generated sufficiently higher rental income for Yorktown than that owed to A&P or the Overlandlord.  (Pl.'s Mem. of Law in Opp. to Defs. Mot. ("Pl. Opp."), ECF No. 91, at 21; Pl. 56.1 ¶ 12.)

A&P's position finds support in the applicable bankruptcy statutory framework, which indicates that adequate assurance simply requires establishing "future performance by the assignee" of a lease.  11 U.S.C. § 365(f)(2)((B).  Courts have further explained that adequate assurance is not "an absolute guarantee of performance" but rather a means of affording a "landlord with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy."  *In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 675 (Bankr. S.D.N.Y. 2012) (citing *In re M. Fine Lumber Co.*, 383 B.R. 565, 572 (Bankr. E.D.N.Y. 2018); *In re Natco Indus., Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985)).  Thus, the applicable law reveals A&P had no obligation during its bankruptcy proceedings to undergo the exacting review of Yorktown's financials for which Defendants argue because the lease documents provided the type of assurance

that is contemplated by bankruptcy law.  As Defendants do not offer any other argument to dispute A&P's contention that it discovered the at-issue conveyances on August 20, 2014 during a post-judgment deposition of Friedman, the Court concludes that A&P's claims are timely.

In conclusion, an issue of triable fact exists as to the actual intent underlying the purportedly fraudulent conveyances.  Thus, both A&P and Defendants' motions are DENIED on this claim.

### B.  Constructive Fraudulent Conveyance under NYDCL § 273-a

To prevail on a claim for constructive fraudulent conveyance under NYDCL § 273-a, "a plaintiff must establish (1) that the conveyance was made without fair consideration; (2) that the conveyor [was] a defendant in an action for money damages or that a judgment in such action has been docketed against him; and (3) that the defendant has failed to satisfy the judgment." *Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 641 (2d Cir. 2016) (internal quotations and citations omitted).  Unlike with actual fraudulent conveyances, the defendant's intent is irrelevant to this analysis.  *Lyman Commerce Sols., Inc. v. Lung*, No. 12 Civ. 4398(TPG), 20115 WL 1808693, at *5 (S.D.N.Y. Apr. 20, 2015).

An important factor in assessing if a conveyance is constructively fraudulent is whether there was fair consideration, as defined under NYDCL § 272.  For a conveyance to have fair consideration, (1) "the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange"; "(2) such exchange must be a 'fair equivalent' of the property received;" and (3) "such exchange must be 'in good faith.'" *In re Sharp Intern. Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005) (internal quotation and citations omitted).

Good faith is an "indispensable condition in the definition of fair consideration." *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d 356, 360 (S.D.N.Y. 2012) (quoting *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 213 (2d Dep't 1979)).  A plaintiff may establish a lack of

good faith by establishing the absence of any one of the following factors: "(1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Integrity Elecs., Inc. v. Garden State Distribs., Inc.*, No. 14 Civ. 3197 BMC, 2016 WL 3637004, at *8 (E.D.N.Y. June 30, 2016) (quoting *Amusement Indus., Inc. v. Midland Ave Assocs., LLC*, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2016)). "Transfers to corporate insiders—that is, controlling shareholders, officers, and directors—are presumed to be in bad faith." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 448 (S.D.N.Y. 2014). Good faith may also be lacking when a conveyance is made "as part of a series of transactions evidently devised to protect his [or her] assets from attachment." *Id.*

Here, as a preliminary matter, there is no dispute that Yorktown was a defendant for monetary damages in the Underlying Action and that it has not satisfied any portion of the Judgment to date. The primary issue is whether there was fair consideration for any purported conveyance during the Underlying Action. To this end, A&P points to various transactions it seeks to set aside as constructively fraudulent for lack of fair consideration. (Pl.'s Reply in Supp. of Summ. J., ECF No. 101, at App'x A.) Those conveyances fall into three categories: (1) Friedman's salary; (2) management fees; and (3) loan, loan repayments, and distributions. (Pl. Mot. 23-25.) The Court considers each in turn.

### 1. *Friedman's Salary*

A triable issue of fact exists as to whether Friedman's salary was for fair consideration and thus constitutes a constructively fraudulent conveyance. Although Defendants correctly note that there is a presumption of good faith regarding salaries, that presumption can be rebutted. *See Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124(JGK), 2015 WL 3561409, at *11 (S.D.N.Y.

June 8, 2015); *In re TC Liquidations LLC*, 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011).  To this end, A&P Points to evidence in the record that raises a question of fact as to bad faith.  For example, although Defendants detail the various services Friedman provided to the Affiliated Companies (Defs. 56.1 ₱ 91), the record also indicates that factors informing Friedman's salary included an entity's financials, Friedman's cost of living and expenses, and his past salary decisions.  (Friedman Aff. ₱ 79; Ribaudo Dep. 102:9-24.)  As questions of fact remain on this issue, the Court DENIES both parties' motion for summary judgment on these alleged constructively fraudulent conveyances.

   2.  *Management Fees*

   A similar conclusion is warranted for Country Markets' management fees.  As an initial matter, because the management fee allocations are made between "corporate insiders," there is an initial presumption that the allocations lack of good faith to the extent such allocations may be satisfying an antecedent obligation.  In rebuttal, Defendants maintain—and A&P does not readily dispute (*see* Pl. Resp. ₱₱ 154-56)—that the Affiliated Companies' direct expenses were paid as they became due and that such funds were swept daily into Country markets' accounts.  (Taylor Aff. ₱₱ 36-37; Okun Aff. ₱₱ 7-13.)  Defendants further contend that these fee allocations were not cash payments because the entities had been making concurrent payments.  (Defs. Opp. 23.)  Defendants also note, as previously explained, that these various management fee allocations were consistent over time.  (*Id.* at 22.)

   On its face, Defendants position, without countervailing evidence, could potentially overcome the presumption of a lack of good faith that otherwise attaches to such insider transactions. *See Am. Federated*, 126 F. Supp. 3d. at 407 (explaining that where companies satisfied monthly obligations as they came due to a management company for fair equivalent value, such payments were for fair consideration even if it involved a corporate insider).  A&P, however, points to

evidence in the record, which the Court has already noted, that indicates that the end-of-year fee allocations, notwithstanding any alleged contemporaneous sweeping of funds, were untethered to any specific services.  (*See* Pl. 56.1 ⁋⁋ 66, 71, 79; Defs. 56.1 ⁋⁋ 152-59; *see also* Friedman Aff. ⁋ 79.)  A&P maintains that this evidence reveals that the fees were not, in fact, a contemporaneous exchange for value as required under NYDCL § 272.  (Pl. Opp. 18.)  Rather, A&P argues, the management fees were repayments of antecedent debts to a corporate insider.  (Pl. Mot. 24).

Overall, these competing explanations raise a material dispute as to whether the management fees were tied to contemporaneous services rendered rather than being unrelated allocations determined at year's end.  Resolution of this question by a trier of fact will be critical to determining whether the management fees were, in fact, constructively fraudulent conveyances that should be set aside.  *Cf. Am. Federated*, 126 F. Supp. 3d at 407 (concluding that there is no constructively fraudulent conveyance where plaintiff failed to cite evidence "that any of the [] companies' monthly fee payments satisfied an arrearage rather than a new monthly obligation").  The Court DENIES both parties' motion for summary judgment on these alleged constructively fraudulent conveyances.

### 3. *Loans, Loan Repayments, and Disbursements*

The last remaining set of transactions for the court to address are the various loans, loan repayments, and distributions from Yorktown to Friedman.  Turning to the loan and loan repayments, the Court again notes that, where transactions between corporate insiders, even in satisfaction of an antecedent debt, carry a presumption of a lack of good faith that Defendants must rebut.  *See CIT Grp./Commercial Servs., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*, 25 A.D.3d 301, 303 (1st Dep't 2006) (concluding that, even assuming payment was in partial satisfaction of an antecedent debt, it lacked good faith because transactions between corporate insiders "are presumptively fraudulent").  To this point, A&P reiterates its primary contention that Defendants'

41

no-interest loans were generally made without an agreement or any repayment terms.  (Pl. 56.1 ¶¶ 81-83.)   And although Defendants challenge the classification of certain of the loans and disbursements flagged by A&P, they do not rebut the otherwise undisputed evidence that at least some loan and loan repayments were made by and to a corporate insider at a time when Yorktown was in the midst of litigation with A&P.

*American Federated* reveals why this category of loan and loan repayments should, as a matter of law, qualify as constructively fraudulent conveyances.  In *American Federated*, defendants had ownership of and/or managerial authority over certain companies that were "significantly 'in arrears'" on its lease obligations to plaintiff.  126 F. Supp. 3d at 407-8.  Notwithstanding this insolvency, defendants caused these companies to repay antecedent debts.  *Id.* at 408.  The Court determined that defendants qualified as corporate insiders because of their ownership of or managerial authority over the companies and that, as a result, the payments lacked fair consideration. *Id.*  Such is the case to here.  Friedman maintained ownership and control of the Affiliated Companies, and, while exercising such dominance, he caused various loans and loan repayments by the Affiliated Companies during the pendency of the litigation.  Coupled with the record establishing that loan balances were not necessarily paid off at year's end (Pl. Add. ¶ 5), the undisputed evidence establishes that these loan payments qualified as constructively fraudulent conveyances under NYDCL § 273-a.  Therefore, although there is a question of fact as to which transactions are at issue (*see, e.g.*, Defs. Resp. ¶¶ 125-27; Ribaudo Rep. ¶¶ 124-132d), those loan and loan repayments made after A&P filed counterclaims can be avoided as constructively fraudulent.

The Court reaches a similar conclusion as it relates to Friedman's distributions to himself. Defendants point to their expert report to maintain that any distribution Friedman triggered was done when the entity at issue was profitable.  (Defs. Opp. 15; Ribaudo Rep. ¶¶ 78, 109.)  This contention,

however, fails to raise a triable issue as to the absence of good faith underlying Friedman's triggering of distributions during the pendency of the Underlying Action. *See ACLI Gov't Secs. v. Rhoades*, 653 F. Supp. 1388, 1391 (S.D.N.Y. 1987) ("The burden of proof to establish that a debtor's conveyance was made without fair consideration is on the creditor.  However, where the evidentiary facts as to the nature and value of the consideration are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee.").  The Court therefore concludes that, as a matter of law, these distributions lack fair consideration and thus can be avoided as constructively fraudulent conveyances. *See First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 117-18 (E.D.N.Y. 2012) (concluding that transfers of funds from defendant company to individual defendants who were president and vice president/owner of the company was constructively fraudulent under NYDCL § 273-a).

A&P, however, is not entitled to summary judgment on its constructively fraudulent conveyances premised on Yorktown's loan repayment to HSBC.  That loan began prior to the commencement of the Underlying Action and, unlike other loan and loan repayments identified by A&P, the conveyances were to a third party (not a corporate insider).  A&P thus retained the burden of establishing that these transactions lacked fair consideration or good faith. *See In re Sharp*, 403 F.3d at 54 ("[B]ad faith does not appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.'").  In moving for summary judgment, A&P has failed to meet this burden at this time.

In conclusion, the Court has determined that, as a matter of law, certain to-be-determined loan transactions from Yorktown to Friedman, as well as any distribution caused by Friedman, during the pendency of the Underlying Action qualify as constructively fraudulent discharges under NYDCL § 237-a.  The Court will GRANT A&P's motion for summary judgment on this specific

category of conveyances. The Court, however, concludes that A&P has failed to establish the absence of a genuine dispute of material fact regarding whether Yorktown loan payments to HSBC qualify as constructively fraudulent discharges. Accordingly, to the extent A&P seeks summary judgment on this branch of its claim, the Court DENIES its motion for summary judgment.

**III.      Claims against Jestam Global and Jestam Realty**

Defendants move for summary judgment dismissing Jestam Global and Jestam Realty from the case. (Defs. Mot. 25.) As to Jestam Realty, Defendants argue that Jestam only began conducting business in 2015, which would purportedly be four years after A&P maintains assets were stripped from Yorktown. (*Id.* n.78.) Although Jestam Realty had a bank account set up in April 2004, it did not conduct activity; rather, it was not until 2014 that the company started being used to pursue a real estate investment. (Friedman Aff. ¶¶ 83-90.) Relating to that investment, Defendants maintain that A&P has only identified one transaction—Friedman's transfer of $350,000—to support its veil piercing and fraudulent conveyance claims. (*See* McKinlay Rep. 22.)

A&P respond that Friedman controlled Jestam Realty at all relevant times. (Pl. Opp. 25.) On that basis, A&P asserts, in conclusory fashion, that the $350,000 transfer was intended to hinder, delay, and defraud A&P as the money came from income Friedman received from the Affiliated Companies. (*Id.*; Pl. 56.1 ¶ 109.) Ultimately, A&P has not pointed to any evidence in the record that creates a material question of fact as to how Jestam Realty was an alter ego of Yorktown and the other Affiliated Companies. The Court therefore agrees that Jestam Realty should be dismissed.

Regarding Jestam Global, Defendants maintain that the company is an inactive entity that has never conducted any business, has no bank account, and has never filed a tax return. (Defs. Mot. 25; Friedman Aff. ¶¶ 81-82.) A&P counters that Jestam Global was created in the wake of the Judgment, citing records from the New York Department of State that indicate that Jestam Global

44

was created on January 17, 2013 and was dissolved on October 26, 2016.  (Theisen Opp. Aff. Ex. 16.)  This evidence, alone, does not seriously raise a genuine dispute of material facts about whether Jestam Global was an alter ego of Yorktown and the Affiliated Companies and A&P has not come forward with any other evidence.  The Court thus also agrees that Jestam Global should be dismissed.

In conclusion, the Court GRANTS Defendants' motion for summary judgment dismissing Jestam Realty and Jestam Global as a defendant.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The parties are directed to appear for a pre-trial conference on July 9, 2020 at 12:00 PM.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 81 & 84. The Clerk is further directed to terminate Defendants Jestam Global Ltd. and Jestam Realty, LLC from this case.

Dated:    May 4, 2020                                    SO ORDERED
          White Plains, New York

                                        _____
                                              NELSON S. ROMÁN
                                          United States District Judge

45